POPE & TALBOT, a corporation, *et als.,* owners of the schooner Mary E. Foster, *vs.* THE FEARLESS, etc., J. D. SPRECKELS & BROTHERS COMPANY, claimant.

## November 15, 1910.

*Towage—Duty and authority of the master of a tug:*   In a towing undertaking in the United States, the master of the tug must assume control of the tow and the persons in charge thereof.

*Same—Duty of the master of the tow:*   The exercise of reasonable care and skill subject to such control, is incumbent on the tow.

*Same—Responsibility of tug—Responsibility of tow:*   If a tug unwarrantably takes its tow into a place of danger, it is not relieved of responsibility for resulting injury, if the master of the tow fails to act in the emergency with the skill of a regular pilot.

*Same—Same—Acting on information of third parties:*   A master of a tug is bound to know his home port and is not relieved of responsibility, if, obeying the signal of a dredger, which he must pass with his tow, he runs into danger and the tow is injured.

*Same—Rule of reasonable care and skill on the part of the tug—Exception:*   There is no exception to the rule requiring reasonable care and skill from the master of a tug engaged in towing, except possibly in case of inevitable accident to such master.

*Ordinary care, failure to exercise, because of intoxication:*   One who voluntarily incapacitates himself through intoxication from the ability to exercise the ordinary care which may be required of him, may not plead such inability as an excuse for an injury to others brought about by a want of ordinary care induced by such intoxication.

*Towage—Breach of towing contract:*   It is a breach of a towing undertaking on the part of the owners of a tug if the master is intoxicated during performance.

*Same—Liability of tug for injuries resulting from want of ordinary care—Assumption of risk:*   In the midst of a towing undertaking, the master of the tow ascertained that the master of the tug was intoxicated, but elected to go on with the engagement, which resulted in injury to the tow through the negligence of the master of the tug induced by such intoxication. *Held,* that the assumption of such risk by the master of the tow, did not re-

lieve the tug from liability, even though, under the circumstances, the tow might possibly have made other arrangements.

The same rule applies where a tow, on approaching a hazardous passage, does not signal the tug to stop but assumes the risk of proceeding.

*Award of damages—Subrogation:* There having been proceedings for general average on account of repairs, and the cargo having contributed, libelants are awarded full damages subject to the right of subrogation of the cargo owners.

*In Admiralty:* Libel *in rem* for damages for injury to tow.

*Kinney, McClanahan & Derby* (Kinney, Ballou, Prosser & Anderson on the Brief), Proctors for Libelants.

*Holmes, Stanley & Olsen* and *R. W. Breckons,* Proctors for Claimant.

DOLE, J.   This is a case for damages for injuries received by the vessel of the libelants by stranding while being towed by the tug Fearless, and, as originally brought, included the dredger Pacific as one of the defendants, claiming that she was liable in that she signalled the approaching tug to pass her on her starboard side, which was an unsafe passage for her tow, and, being taken, led to the stranding of the libelants' ship. Under exceptions, a decision was reached in which the non-liability of the Pacific was recognized and the case thereafter, under amended libel, was against the Fearless.

It appears that on March 5, 1906, the dredger Pacific was operating in the entrance channel of the Honolulu harbor near the west side, and was discharging the dredged material through a pipe line running to the east side of the channel, which line closed the channel for the time being on that side. On that day between four and half-past four in the afternoon, the Mary E. Foster,—a four-masted schooner owned by the libelants, of 839 tons register, 202 feet long on the keel, and 235 feet over all, breadth 40 1-6 feet, 15¾ feet depth of hold, and drawing 19 feet with the cargo of sugar with which she was then loaded,—cast off from a wharf in the inner harbor and was taken in tow by the Fearless for the open sea. Upon

starting to tow the Mary E. Foster, the Fearless blew four whistles and, no reply being made by the dredger, blew four more when near the lighthouse, which were immediately answered by four whistles from the dredger. The Fearless then, at a speed of from six to seven knots an hour, and with a towing line 40 to 60 fathoms long, proceeded to tow the Mary E. Foster through the channel left between the dredger and the west side of the channel, and the Mary E. Foster, in passing into such channel, struck a glancing blow on the dredger's quarter or a scow moored to the starboard side of the dredger,— which was the side toward the west bank of the channel,—and immediately afterwards grounded in the shallow water near the reef at the west side of the channel, and thereupon the Fearless made several attempts to pull her off, first by a hawser attached to her bows and then by one attached to her stern, and then desisted; the United States Revenue Cutter Manning also attached a hawser to her stern. Both of these vessels remained attached to her doing nothing until a quarter to eleven that same evening, when it was high water, at which time the Mary E. Foster floated off the reef, whereupon the Manning let go of her hawser and went away and the Fearless proceeded to tow her stern first, with a long hawser attached to her stern, up the harbor, in which operation the Mary E. Foster again grounded on the south-east side of the channel at a point near the boat house known as the Myrtle Boat House; and thereupon the Fearless pulled her off from the reef at this place and took her into the harbor and tied her up at one of the docks.

The libelants claim that the space between the dredger and the west side of the channel was not sufficient for a safe passage of the tow, and that in attempting to make such passage the Fearless was guilty of negligence and was responsible for the stranding; and that after the Mary E. Foster floated off from the first stranding the Fearless was guilty of negligence, carelessness and want of skill in the methods used by her in attempting to tow the Mary E. Foster into the harbor, at which operation the second stranding occurred.

The claimants contend that the space between the dredger and the northwest side of the channel was sufficient to justify the attempt of taking the tow through that space; that the signal by the Pacific indicated that the passage on the west side of it "was clear and navigable"; and that the accident which happened was due to the unseaworthy condition of the steering gear of the Mary E. Foster which was such that her rudder would not follow the movements of the tiller on account of a defective condition of the rudder post which allowed it to twist, in consequence whereof she did not readily mind her helm. They also contend that the second stranding was due to the failure on the part of the master of the Mary E. Foster to observe the instructions given by the master of the Fearless, particularly that on floating off he should drop an anchor, and for his failure to observe other directions given him and to observe proper precautions.

After the stranding, a survey on behalf of the underwriters was made, both while the Mary E. Foster was in the water and after she was taken on to the marine railway. Mr. Lyle, the shipwright who made the repairs and who was familiar with the vessel, having previously made repairs on her from time to time, also testified as to her condition after the stranding. It was found that she was injured somewhat in the bows, her garboard seams on both sides from forward running aft having started and requiring recaulking; that her rudder was so seriously injured that a complete new rudder was necessary; that the stern post was sprung, and that there were various other minor injuries requiring repairs.

There appears to be some difference of opinion in the rule of responsibility of a tug engaged in towing between the English and American cases. Thus, "A vessel in tow during a thick fog, knowing that it was dangerous to proceed, did not order the tug to stop, and the vessel in consequence ran aground:—Held, in an action by the owners of the tow against the owners of the tug for damages, that the vessel in tow contributed to the accident." (Syllabus) *Smith v. St.*

*Lawrence Tow-Boat Co.,* L. R. 5 P. C. 308.   But in *The Adelia,* 154 U. S. 593, the tow was injured while being towed under hazardous circumstances; the wind was strong, the night was dark—"spitting snow occasionally," no landmarks nor any visible thing were discernible.   The court held " that there was no contributory negligence on the part of the libelant." Also in *The Niobe,* L. R. 13 P. D. (1888) 55, 59, and *Spaight v. Tedcastle,* L. R. 6 App. Cas. 217, 221, where " the duty of the tug was to carry out the directions received from the ship and the pilot was in charge of it," while in *Transportation Line v. Hope,* 95 U. S. 297, 299, the court says, "As a necessary incident of this engagement (contract for towing), the defendants were entitled and were bound to assume supreme control and direction of the plaintiff's boat, and of the persons in charge of her, so far as was necessary to enable them to fulfil their engagement."   See also *Pettie v. Boston Tow-Boat Co.,* 49 Fed. Rep. 464, 466.   It is suggested that this divergence may be somewhat due to the fact that in the English cases referred to, the tows carried licensed pilots which the court in *The Niobe,* supra, alludes to and to another fact as well, that in English waters " the officers of the tow are usually . . . . of a higher class and better able to direct the navigation than those of the tug."   Whereas in the different conditions prevailing in the extensive waterways of America, where an immense towing business has developed in connection with freighting barges and canal boats, in which it would appear that pilots are not usually employed to take charge of the tow, this circumstance would tend to reverse the rule so far as canal boats and freight barges are concerned, as to the comparative competence of officers of tugs and of tows, recognized in England.   If therefore it has come about that masters of tugs in America are generally superior to the officers of their tows, in towage work, in the absence of pilots, the development of the American rule as to responsibility naturally follows.   It is probably true, however, that the practice in America, in the towing of canal boats and freight barges, as to responsibility,

varies somewhat from that prevailing in the case of the towage of sailing vessels, for in *The Adelia,* supra 595, it appears that the rudders of the several barges of the tow were lashed, and an expert tug captain testified that "they don't expect to have anyone on the deck of the tows; that it is not customary and is not required." We find, however, from other American cases, that sometimes barges in tow are expected to be carefully steered. *The N. & W.. No. 2,* 102 Fed. Rep. 921, 923. At any rate it still stands that in the towage of sailing vessels the main responsibility and the control of the tow is in the tug. In *The Margaret,* 94 U. S. 494, 496, which was a case involving the towing of a brig into port, the court said: "The tug was the dominant mind and will in the adventure. It was the duty of the brig to follow her guidance, to keep as far as possible in her wake, and to conform to her directions. The exercise of reasonable skill and care within this sphere was incumbent on the tow."

Objections' to testimony noted in the depositions and transcript of evidence, were not pressed by the parties and the court infers that they were waived.

The first question to be considered is whether the first stranding was caused by the negligence of the Fearless or by mismanagement on the part of the Foster or by the unseaworthy condition of the rudder of the latter. The second question is whether the second stranding was due to the negligence of the Fearless or to non-observance of instructions given by the master of the Fearless and want of care on the part of the Foster.

The claimant put on witnesses to show that the rudder was in an unseaworthy condition independently of the accident. This defense was adroitly managed, but to my mind is insufficient to overcome the evidence that the condition of the rudder after the stranding was mainly due to the second stranding, in which the vessel was towed stern first against the bank of the channel, probably a steep bank, the dredging in that part having been finished, and also as shown from the fact that she was easily pulled off. This stranding threw the rudder blade vio-

lently around to the starboard side, causing the wheel to spin. The rudder was swung around further than it was possible for it to swing normally according to its adjustment to the stern post, which allowed it to swing to an angle of 45 degrees, whereas it was jammed around nearly at a right angle until it struck the planks of the counter. The rudder, on being removed from the ship, showed a new break in its stock in the region of the bottom of the trunk. This, according to the witnesses for the libelants, was noticeably a new break,—a break caused by a violent lateral twist, breaking and splintering the fibers of the wood, and which so weakened the rudder post that, according to the testimony of Captain Johnson, when the rudder was lying on two rollers ten or twelve inches thick, the rudder post sagged until its top touched the ground. The witnesses for the claimant were oblivious of this condition of the rudder post and simply testified to checks and quarterings which they affirmed to be the natural result of a process of checking common in oak timber, which, they claim, happened before the accident and were in no way affected by it; and which condition of things, according to them, rendered the rudder unseaworthy. Cushman, 11, 13. The witnesses for the libelants noticed dents in the copper in the lower part of the rudder blade, several dents showing coral. The witnesses for the claimant did not see any evidence of coral or any evidence of a collision of the rudder against coral. The witnesses for the libelants testified to general destruction of the equipment by which the rudder is hinged to the rudder post, made of pintles fastened to the rudder hinging into gudgeons on the rudder post corresponding to such pintles, all made of brass, some of which were torn away, some bent, and the partially displaced condition of the stern post, showing a violent and irresistible blow. The witnesses for the claimant testified to cracks and bends in these and attempted to minimize this condition of things to an extent which would permit them to explain it as a condition that existed before the accident. To my mind this part of the defense is overborne by the evidence

which it attempts to rebut. This conclusion is also supported by the testimony of Captain Johnson of the Foster, who says, in answer to the question "How did the Foster steer prior to the accident?" "Very good I considered, the same as she— she steered all right, as any other vessel would steer, to my knowledge."

I find that the condition of the rudder and rudder post after the stranding, with the exception of some checking which existed in the rudder post but which did not so affect it as to materially diminish its stiffness or cause any apparent defect in the steering capacity of the rudder and the steering gear, was caus∪d by the second stranding of the Mary E. Foster, in which she went violently against the bank stern first, forcing the rudder to the starboard side beyond its normal position and thereby causing the injuries that have been shown.

In regard to the responsibility for the accident, Captain Slattery, whose testimony is very definite, who was the inspector of the dredging operations on behalf of the United States Government and was constantly visiting the dredger and who had just left it a few minutes before the stranding, testified in the most explicit way that the attempt to take the tow through the passage was dangerous and reckless. He says, on page 45 of his deposition, "It was the height of imprudence for the captain of the Fearless to attempt to take any tow through such a narrow passage." He explained that there was a bend in the channel just before reaching the dredger and that upon leaving the passage the dredger would naturally turn toward the middle of the channel to get away from the side of the channel; that on a long tow line the influence exerted on the direction of the tow is slight; that in the change of direction much would depend on the man at the helm of the tow and such a man should be thoroughly familiar with the harbor. He said the tendency of these two turns would be to throw the ship against the dredge; that would have to be counteracted by the helmsman of the Foster; and then he must look out to keep his ship off the reef. The circumstances were such that the mo-

ment he turned to escape the dredger the ship was directed toward the reef and this movement would have to be corrected by a contrary movement of the wheel and with great promptitude in order to prevent stranding.   Captain Slattery's evidence shows that he considered the possibility of taking such a tow through the available space to depend on the Foster's having a good pilot aboard.   Moreover it does not convincingly appear from the evidence that the signals by the dredger indicated that the passage west of it "was clear and navigable." Captain Ollson said (Dep., p. 6), the blowing of the four whistles by the dredger meant "everything all clear."   The inspector's report for March 5th (Exhibit E) has the following: "Stopped three times to let S. S. through pipe line 2 :20." If the operations were interrupted three times to let steamers through the pipe line at 2 :20 p. m., is it not probable that the dredger expected to open its pipe line for the Fearless at 4 :30, and that her rapid approach prevented this and that the signal meant merely that the pipe line would be opened?   The master of the Fearless, upon finding that his first signal was not answered should have immediately repeated it without proceeding as he did as far as the lighthouse before signalling again.   It would appear that by this delay the dredger was not given time to open its pipe line before the tow should have to pass it on one side or the other.   Captain Johnson of the Foster testified that the dredger blew one whistle after the four whistles, which he understood to mean that they were to pass the dredger on its west side.   Neither Captain Ollson nor any other witness refers to this one whistle, and no one from the dredger was called to testify on this point.   In any case the master of the Fearless was bound to know the channel and whether it was safe at that time to make the attempt to pass the dredger on its west side, and he was not relieved of responsibility even if the dredger signalled that it was all right to pass on that side.   *The Margaret,* 94 U. S. 494, 497.

After the Mary E. Foster floated off from the first stranding the conduct of the Fearless was incomprehensible, until the

evidence came into the case that her master was in an intoxicated condition at the time. With a long hawser attached to the stern of the Foster, she seesawed up the channel and just before the second stranding ran into the Foster, carrying away davit guys and stanchions at the Foster's stern. Captain Ollson's statement that he instructed the master of the Foster to drop his anchor was denied and Captain Johnson denied that any instructions were given to him. Captain Ollson's statement that he had to jerk the Foster to keep her from colliding with the dredger after the first stranding and that the momentum kept up until she ran aground the second time, during which time he was engaged in shortening his hawser, presents circumstances that were not noticed by any other witness. To them it appeared simply that he took her in tow and towed her stern first up the channel. The tide was at flood, the sea was smooth, and the wind was light from the land, and no possible reason appears why the second stranding should have occurred except the intoxication of the master of the tug above referred to. The evidence that he was intoxicated is of such a reliable character that it should have been met by the defense if it had the means of rebutting it. But no attempt was made to deny or disprove this important charge.

Captain Ollson says that the distance between the two strandings was about 1500 feet (p. 31). By a reference to the map (Claimant's Exhibit A), it appears that the distance from the position of the Mary E. Foster when she was jerked by the Fearless to prevent her from colliding with the dredger to the place of her second stranding was at least 1200 feet. The court has no data upon which to base an opinion as to the force of such jerk or jerks, but it is reasonable to believe that it was no more than sufficient to keep the Foster from colliding with the dredger. That such a jerk should have given the Foster a momentum which was sufficient to carry her 1200 or 1500 feet up the channel against the light land breeze and to cause the severe injuries to the rudder shown by the evidence upon striking the reef at the second stranding, would seem unlikely. At

any rate, whatever the condition was, such momentum was caused by the Fearless. The Fearless was present with steam up and with a hawser attached to the Foster. It could have required no unusual effort, or nautical skill, to have applied the slight force necessary to have swerved the Foster away from the reef to which she was approaching, certainly with slow speed if she was moving solely from the momentum caused by the jerks referred to. Taking the account of Captain Ollson alone, there is no justification or excuse for the second stranding. The Mary E. Foster was under his control within his jurisdiction and upon him alone was the responsibility for her movements at the time. *Transportation Line v. Hope,* 95 U. S. 297, 300.

The claim of the defense that there was mismanagement on the part of the master and crew of the Mary E. Foster is not borne out by the evidence. It is true that according to the testimony of Captain Johnson it would appear that he should have acted sooner than he did in porting his helm in order to clear the dredger, in which case the next operation of starboarding it might have rendered his vessel less liable to the stranding, but not being a skilled pilot of Honolulu harbor, so far as appears, it was natural that he simply followed the tug until her movements to port caused by the two turns already referred to, which would tend to change the direction of the Foster toward the dredger, apprised him of the immediate necessity of taking the action which he did take; and anyone, not a skilled pilot, would naturally hesitate before making such a movement, as the danger of running his vessel into a new danger from stranding in water of unknown depth, was obvious.

It is not clear, however, that such earlier action would have saved the Foster from the first stranding. The Fearless had taken her into that position which required the skill of a pilot for the handling of the Foster, which skill is not required nor expected on a vessel under tow in the Honolulu harbor. Here was a vessel over 200 feet long towed into a short passage not over 105 feet wide, according to Slattery (Dep., p. 15) and

which Ollson says was from 80 to 100 feet wide, requiring a turn just before reaching it and another one on emerging from it. The failure of the master of the Foster to do the best thing possible in such an emergency, if he did fail, does not appeal to me to make out such a case of contributory negligence as would lessen the liability of the Fearless, which, having taken its tow into a dangerous position, cannot relieve itself of responsibility on the ground that the master of the tow did not act with skill of a regular pilot and extricate his ship from such position.

In relation to the evidence of the intoxication of the master of the tug, the respondent contends that if such evidence is reliable, the claimant is relieved from liability for the second stranding, inasmuch as such intoxication being known to the master of the Foster before she came off from the reef after the first stranding, and he still continued the employment of the tug, he assumed the risk of all injury that might result from such intoxication, which included the damages resulting from the second stranding, if that resulted from a want of ordinary care and skill induced by such intoxication.

No precedent for this contention has been submitted nor am I able to find any. " The proposition is a novel and interesting one. I know of no case in which it has even been discussed. Indeed, the very fact that no claim of this description has ever been made is worthy of suggestion as indicating the view generally taken by the profession." *The James P. Donaldson,* 19 Fed. Rep. 264, 269. The authorities cited do not apply but relate mainly to circumstances of contributory negligence.

If " a person cannot voluntarily incapacitate himself from the ability to exercise ordinary care and then recover for an injury to which a want of ordinary care on his part, while so intoxicated, proximately contributes" (7 Am. & Eng. Enc. Law, 441-442), it would seem to follow that a person who voluntarily incapacitates himself through intoxication from the ability to exercise the ordinary care which may be required of him, may

not plead such inability as an excuse for an injury to others brought about by a want of ordinary care induced by such intoxication.

In a contract for towing, there is an implied understanding not only that the tug shall be properly equipped, including a supply of fuel, but also that she shall be properly manned, which includes a competent master. There is a breach of this undertaking if the master during performance is so intoxicated as to become more or less incompetent, and if by reason of such incompetence so induced, the tow suffers damage, the owners of the tug are responsible. Can they be relieved of this liability or any part of it, if the master of the tow is informed of such intoxication, on the theory of assumption of the risk by him, as is claimed by the defense?

Is there any exception to the rule requiring ordinary care on the part of the master of a tug engaged in towing?

If such intoxication is known to the master of the tow and he still proceeds with the towing enterprise and injury results in consequence of the intoxication of the master of the tug, it is not contributory negligence on the part of the master of the tow but is more in the nature of an assumption of a risk. It would seem to be against public policy to allow such action by the master of the tow to absolve the owners of the tug from responsibility, as such an exception to the rule of ordinary care would tend to lessen their sense of responsibility for the conduct of their employes, and to promote incompetence among the masters of the tugs through indulgence in intoxicating liquors. There are many occasions when the assumption of a similar risk is almost a necessity, and those accepting such a situation are not thereby deprived of their remedy in case of injury involved in the risk assumed by them. A passenger on a train discovers that the conductor is drunk; he has the freedom of leaving the train at the next stopping place, but it may be hundreds of miles from his objective point and from his home; there may be no hotels near and no other train for half or a whole day, his baggage is in the train; his ticket is

for that particular train, his engagements call for his arrival at a particular time. The railroad company has placed him in this predicament by keeping an intemperate conductor on duty. It is reasonable that the passenger should be free to assume the risk of going on with the intoxicated conductor without losing his remedy for injuries happening through his inefficiency, and it is unconscionable that the company should be absolved from its implied guarantee to have competent conductors on its trains, merely because the passenger takes a risk that he may be almost compelled to take. The company has placed him in this position and its responsibility cannot be avoided.

The risk assumed by the master of the Mary E. Foster is not analagous to the usual assumption of risks. The guarantee of ordinary care and skill is always implied in towage contracts, and there are no exceptions to the rule, unless possibly in the case of some inevitable accident by which the master is incapacitated, as, for instance, through a paralytic attack. Even a contract that a vessel is to be towed at the risk of her owners does not relieve the tug from liability for injury to the tow resulting from a want of reasonable care and skill on the part of those in charge of the tug. *The Steamer Syracuse,* 79 U. S. 167, 171; *The Somers U. Smith,* 120 Fed. Rep. 569, 576. See also *R. R. Co. v. Lockwood,* 84 U. S. 357.

The claimant's contention that the master of the Foster assumed the risk in not signalling the tug to stop when he found that it was proposed to take the passage west of the dredger is also covered by the above conclusion and authorities, if I am correct in finding that the first stranding was due to negligence on the part of the Fearless.

I find that the libelants are entitled to damages for the injuries and expenses resulting from the two strandings.

The libelants' statement of costs of repairs, with expenses attendant upon the delay of the vessel and the ascertainment of the contribution due from the cargo, making a total of $5,125.85, as shown by Libelants' Exhibit F and accompany-

ing vouchers, is satisfactorily proved, except that the item of $208.50 for provisions for the crew must be cut down by $10.50, as the ship's carpenter should have been allowed a sailor's rate of forty cents a day instead of seventy-five cents, for the thirty days' delay; and the item of $208.80 paid to Kinney, Mc-Clanahan & Cooper for taking testimony of the crew with stenographer's charge is ruled out, as it is not an expense which may be regarded as proximately caused by the stranding.

The item for one month's loss of net earnings is a legitimate charge, following the precedent of the *Pacific Mail S. S. Co. v. The Pacific* tried in this court, but the court will take the average net profits both of the three years before the stranding and the next three years, less one month for the time the Foster was being repaired, instead of taking the average of the first three years as urged by the libelants. Thus estimated the average monthly net profits are $718.66.

As to the amount contributed by the cargo to the general average, I am of the opinion that it should not be considered in the estimate of damages, for by the payment of such amount, the owners of the cargo are subrogated to the rights of the libelants under this decision according to the proportion of such contribution under the general average.

With these findings the estimate of damages would be as follows:

Cost of repairs .......................$4,499.98
Cost of average adjustment ............   406.57
One month's delay of schooner ..........   718.66
                                        _____
     Total .......................  $5,625.21

Which total amount I find the libelants to be entitled to, with interest from May 23, 1907, the date of the filing of the second amended libel, and costs, except those accruing upon exceptions to the libel and the first amended libel.

*On appeal,* pending in Circuit Court of Appeals.